UNITED STATES OF AMERICA, APPELLANT, *v.*
LEWIS A. SCOTT ELLIOT, RESPONDENT.

(See former opinion *U. S.* v. *Scott Elliot*, 7 Utah, 389.   See, also,.
.  *Burrows* v. *Kimball*, 11 Utah, 149.)

1. PUBLIC LANDS.— STARE DECISIS.— LAW OF THE CASE.— RES·
   JUDICATA.—The supreme court of a territory may on a second
   appeal reverse its former decision in a case involving a ques--
   tion of title of the United States to lands in such territory,.
   where the weight of authority is against such decision and it
   is apparent that injustice will be done, not only in the par-
   ticular case, but in all of the . cases of like character, and'
   where the court is not a court of last resort in the particular·
   case, the rule of *res judicata* is inapplicable.

2. ID.— SCHOOL LANDS.— GRANT BY UNITED STATES NOT ABSO-
   LUTE.—UNLAWFUL FENCING.—Organic act of Utah, section 15·
   (1 Comp. Laws 1888, p. 47, Act of Congress, Sept. 9, 1850),
   provides that when land in such territory shall be surveyed
   under the direction of the Government, sections 16 and 36 in
   each township "shall be and the same are hereby reserved for·
   the purpose of being applied to schools in said territory." *Held*,
   that such grant was not absolute, and the lands on being sur-
   veyed were not so segregated from the public domain as to·
   cease to be under the protection of the act of Congress of Feb.
   25, 1885, making it unlawful to enclose any public lands of the·
   United States, where the party making the enclosure has no·
   claim or color of title made or acquired in good faith.   *U. S.*
   v. *Scott Elliot*, 7 Utah, 389 (26 Pac. 1117), overruled.

(No. 540.   Decided Aug. 31, 1895.   41 P. R. 720.)

APPEAL from the District Court of the First Judicial
District.   Hon. H. W. Smith, *Judge.*

Action by the United States of America against Lewis
A. Scott Elliot for unlawfully enclosing public lands.   From
a judgment for defendant in conformity with the decision

and direction of the Supreme Court on a former appeal (7 Utah, 389) plaintiff appeals. *Reversed.*

*Mr. J. W. Judd,* U. S. Attorney, for appellant.

*Messrs. Zane & Zane,* for respondent.

In this cause the findings show that the land of which the defendant is accused of enclosing contrary to the fencing law, is situated upon a school section. The lower court originally entered judgment upon these findings in favor of the plaintiff. This ruling was reversed upon the ground that a school section was not included in the term "public lands," as used in the fencing law, although the court declined to hold that the title to these school lands was in the territory. *United States* v. *Elliot,* 7 Utah, 389.

It is well to see first what the supreme court has held. The closing words of the opinion are that these school lands are not "public lands," withing the meaning of the fencing law. Since that time that court has held that the title to these lands is still in the United States, and not subject to the control of the territory. *Burrows* v. *Kimball,* 41 Pac. 719, 11 Utah, 149. In addition to this, the decision of this court is exactly right. The two cases of *Barclay* v. *United States,* 19 Pac. 36, and *United States* v. *Bisel,* Id. 215, are not well considered cases, and the point was not raised and has been once expressly disapproved by our Supreme Court on the following train of reasoning:

(*a*) The fencing law applies to the "public lands," and being a penal statute, will be strictly construed. (*b*) The words "public lands;" before the passage of the fencing law had been construed to mean "such as are subject to sale or other disposal under general laws." *Newhall* v. *Sawyer,* 92 U. S. 761. (*c*) Where language is used in a statute reproducing words that have been given a judicial construction, they will be held to be used in that sense.

*The Abbotsford,* 98 U. S. 440. (*d*) An inspection of the law itself shows it was meant to apply only to such land as was subject to settlement or entry under the public land laws of the United States. Section 3 of act of congress, Feb. 25, 1885. (*e*) These school lands are not subject to entry or settlement, because being reserved for a specific purpose, they cease to be a part of the public domain. *Wilcox* v. *Jackson,* 13 Pet. 498. (*f*) Hence, the school lands are not within the the terms of the fencing law. *U. S.* v. *Elliot,* 7 Utah, 389. It seems to me that the reasoning of the Supreme Court is unanswerable, and it is perfectly consistent with the title still remaining in the United States, and does not hold (as United States attorney supposes) that the title has been divested from the United States and put in the territory by the section 15 of the Organic Act. The Supreme Court has held exactly the opposite in *Burrows* v. *Kimball, supra.*

MERRITT, C. J.:

The complaint in this case was filed on the 12th day of December, 1889, by the then United States attorney for Utah, alleging that the lands in township 15 S. of range 13 E., Salt Lake meridian, situate in Emery county, Utah territory, are public lands of the United States, and that the defendant had constructed and was maintaining a fence inclosing a body of public lands of the United States of about 16 miles in area; and that none of the lands so inclosed had ever been entered for settlement or purchased at any of the offices of the United States, nor settled upon nor appropriated with a view to entering or acquiring title to the same. The complaint further alleges that, at the time the fence was made, the defendant had no claim or color of title to any of the said lands so fenced; made or acquired in good faith, and had not theretofor asserted, and does not now assert, any right thereto by or

under any claim made in good faith with a view to entering thereof in the proper land office under the general laws of the United States. The defendant filed his answer to said complaint on the 1st day of February, 1890, in which he denied that all the lands in township 15 S. of range 13 E., Salt Lake meridian, situate in Emery county, Utah territory, were public lands of the United States, but alleged that portions of them had passed irrevocably out of the possession of the plaintiff, the United States, and that other portions thereof had been segregated by the plaintiff from the public domain. The answer also denied that the defendant had inclosed more than about 2,460 acres of land, most of which he alleged he owned in fee, and that a few acres of said land so inclosed were included within the limits of section 16 of said township and range, for which he had his certificate under sections 4 and 5 of the act of June 19, 1885, entitled "An act in relation to county recorders and acknowledgments of instruments in writing," and which had been segregated from public lands of the United States, and that the few acres of said section 16 so inclosed were not public lands of the United States. On the 5th of November, 1890, the case was heard before the Honorable John W. Blackburn, judge of the First Judicial District, and he found the following facts: "That the lands in township 15 south of range 13 east, Salt Lake meridian, Emery county, Utah territory, are public lands of the United States; that the defendant has heretofore constructed, and now maintains, on and through section 16 of said township, a fence built of cedar posts and wire, and thereby incloses about 447 acres of said section; that no part of the said lands so inclosed has ever been entered for settlement or purchased in any land office of the plaintiff; that said land is surveyed lands of the plaintiff, and was surveyed and designated by its proper township and section at the time the defendant

entered thereon; that, at the time said fence was made, said defendant had no claim or color of title to said lands, or any portion of it, made or acquired in good faith, and has not heretofore asserted and does not now assert any right thereto by or under any claim made in good faith with a view to entry thereof in the proper land office under the general laws of the United States." And as conclusions of law from said facts, the court found that the inclosure was unlawful, and should be destroyed in a summary way, unless it was removed in 10 days. The case was appealed to this court by the defendant, and the judgment of the district court was reversed by this court. The opinion was delivered by the Honorable Thomas J. Anderson, and concurred in by Judges Zane and Miner, and will be found at page 389, 7 Utah, and page 1117, 26 Pac.

This proceeding, as will be seen from the foregoing recitals, was instituted by the United States attorney under the act of Congress approved February 25, 1885, making it unlawful to inclose any of the public lands of the United States where the party making the inclosure has no "claim or color of title made or acquired in good faith or an asserted right thereto by or under a claim made in good faith with a view to the entry thereof at the proper land office under the general laws of the United States at the time any such inclosure was or shall be made." When the case was before this court on a former appeal, it was held that the lands contained in section 16 were not public lands of the United States, within the purview of the act of congress above mentioned, because of the reservation of such lands for school purposes by the fifteenth section of the organic act of Utah, which provides as follows: "That when the lands in said territory shall be surveyed under the direction of the government of the United States preparatory to bringing the same into market, sections num-

bered 16 and 36 in each township in said territory shall be, and the same are hereby, reserved for the purpose of being applied to schools in said territory, and the states and territories. hereafter to be erected out of the same." The judgment of the district court having been reversed, the cause was remanded with the direction that the First District Court should proceed in conformity with the opinion in that case, and on the 7th day of July, 1894, the following judgment was entered: "In accordance with the facts found, and the decision of the Supreme Court heretofore rendered, it is hereby ordered and adjudged that the plaintiff take nothing by its complaint, and that this action shall be, and the same is hereby, dismissed." From. this judgment, the United States has appealed to this court, and the case is now here for decision.

The first question is whether the former decision of this court is. to be considered an adjudication by which this court is now bound; in other words, whether it is the "law of the case" in such a sense that this court cannot reverse its own judgment. In the case of *Steele* v. *Boley*, 6 Utah, 308, 22 Pac. 311, it was held that the statute of limitations begins to run, against one who claims public lands as grantee of the United States, in favor of the one in possession, claiming to have acquired the title thus acquired by the patentee, from the date of the patentee's certificate of the final proof and payment. Upon this holding, the judgment in the case was reversed, and the cause was remanded for further proceedings. Such proceedings were had as. resulted in a judgment in accordance with that holding. A further appeal having been prosecuted to this court from that judgment, the former judgment was overruled, and this court held that the statute. of limitations began to run against the patentee of public lands from the United States from the date of the issuance of the patent, and not from the date of the final payment. for the land.     24

Pac. 755.   The rule of former adjudication was pressed upon this court in that case, but the court declined to adopt the suggestion, and reversed its former judgment. It is true that the court gave as a reason that the Supreme Court of the United States had decided the question differently since; but still the fact remains that, whatever may have been the reason for the court's action, it did reverse its former judgment in the same case.   The rule of law which is generally invoked, commonly called the "law of the case," while a safe and salutary one to be followed, has its exceptions.   In the case of *Railway Co.* v. *Shoup*, 28 Kan. 394, this rule was invoked, and was considered by the court.   Judge Brewer (then upon the supreme bench of Kansas, and now upon the supreme bench of the United States), in the case mentioned, used this language: "We do not understand that the rule that a decision once made becomes the established law of the case is a cast-iron rule, and incapable of relaxation in any event.   Cases may arise in which it will be clear that the first decision was erroneous; that, not only in the case at bar will wrong result from adhering to the decision, but also other interests through the state will be imperiled.   Hence, we do not doubt the power of the court to reconsider and reverse a prior decision in the same case."   Why should such not be the case?   Is the court to be bound, at all events, by a technical rule, when it is manifest that injustice will not only be done in the individual case, but, by the precedent made, injustice will follow in other subsequent cases of like character?   Moreover, it may be suggested that this is not a court of last resort in cases of this kind, and therefore the rule of *res adjudicata* is inapplicable.   In the case of *Lawrence* v. *Ballou*, 37 Cal. 518, the court say "that the rule that a previous decision becomes the law of the case applies only to the decisions of the court of last resort."

I come now to the main question in the case, and that is, are school lands reserved under the fifteenth section of the organic act, heretofore quoted, so segregated from the public domain as to cease to be under the protection of the act of Congress of February 25, 1885, heretofore mentioned? It would seem that the mere reading of the two statutes ought to answer this question in the negative. First, let us consider what is the effect of the reservation. It is said, in the opinion of the court in this case, that "a reservation of the lands for school purposes for the use of the people of a territory or state is, in effect, a grant, and the title passes as soon as the lands are surveyed; and patents for school sections are not necessary, and are not issued; and the act is irrevocable without the consent of the people of the territory." I have made a careful examination of the cases cited by the learned judge who wrote that opinion, and do not hesitate to express the opinion that not one of them justifies the language quoted. ·And, considered independently of the authorities cited, the statute reserving the lands cannot, by any possibility, be tortured into a grant of the lands to the territory when the survey is made; much less that the act making the reservation becomes irrevocable without the consent of the people of the territory. The truth is, a reservation can never be said, in the sense of the law, to vest a title in the reservee, where there was formerly no right or title existing in such reservee. There is nowhere, in any of the statutes making such reservation, any intimation that the Congress of the United States intended that such reserved lands should pass out from under the dominion and control of the government; and, in the enabling act passed for the benefit of the people of this territory, Congress has granted such lands to the state to be formed out of the territory, thus clearly showing that at no time has Congress understood the mere reservation of the lands for

school purposes to be equivalent to a conveyance of the same to the people of the territory.

In the case of *Burrows* v. *Kimball* (decided by this court at the June term of 1894), 11 Utah, 149, 41 Pac. 719, this court held that the territorial legislature had no right to pass any law giving authority to the county courts of the several counties to lease the school lands reserved by the organic act, and the question is pertinent, if these lands are not under the control of the territory, under whose control are they? This whole question came before the supreme court of Washington territory in February, 1888, and that court, in a well-reasoned opinion, held, speaking of lands reserved for school purposes, that: "The mere survey of these lands would not cause them to lose their character of public lands. Such change could occur only when they have lost their public character by reason of a *bona fide* right of private entry or ownership under the United States. Now, because of the mere reservation or appropriation by the United States of these sections, for the purpose of being applied to the common schools of the future, do they lose their character of public lands? It is true that they are not public lands in that they are open to entry; but that fact alone does not prevent them being, in a certain sense, public lands. The government has, for a wise purpose, set apart and reserved these lands from the general domain, and announced the purpose for which they will be devoted. It retains control and dominion over these until the happening of a certain event. It is somewhat as a trustee of an express trust. It also retains the right, up to a certain time, to annul the act by which such sections were reserved, and might, within that limit, annul the former act, and throw these lands open as public lands. This reserved right in the government must give it control over these lands as absolute as that of any owner could be." Reasoning further, the court says, in

speaking of the protection of school lands from trespassers: "The power of the United States to prevent any such wrong must be conceded, or the wrong would go unpunished." *Barkley* v. *U. S.*, 19 Pac. 37. And such is the case in this territory.

This court has decided that the territory has no right to pass any law concerning the disposition and control of the lands; and, if it shall now hold that the general government had no such right, then they are left entirely without any protection, and open to every one. The supreme court of the territory of Montana has likewise considered this question, and has come to a conclusion in harmony with that of the supreme court of Washington, and at variance with the decision of this court. *U. S.* v. *Bisel*, 19 Pac. 251. It will be found by an examination of the opinion of the chief justice, McConnell, in the Montana case, that the very cases cited by the learned judge who delivered the former opinion in this case were urged upon the court, and that the chief justice reviews these cases, and shows beyond question that they do not decide what is claimed. This court has held, speaking through Justice Bartch, in the case of *Hyndman* v. *Stowe*, 9 Utah, 23, 33 Pac. 227, that the title to these school sections is in the United States. This opinion is in direct conflict with the language heretofore quoted from the case in 7 Utah. The truth is, the decisions of this court upon this question are in a state quite confused, to say the least.

Upon a full review of this case, I am of the opinion that the judgment should be reversed, and the cause remanded for a new trial.

Bartch, J., concurs.